**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OHIO
EASTERN DIVISION**

| | | |
|---|---|---|
| JUANITA DELGADO, | ) | CASE NO.  1:11-cv-327 |
| | ) | |
| Plaintiff, | ) | |
| | ) | MAGISTRATE JUDGE |
| v. | ) | VECCHIARELLI |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | **MEMORANDUM OPINION AND** |
| Defendant. | ) | **ORDER** |

Plaintiff, Juanita Delgado ("Plaintiff"), challenges the final decision of Defendant, Michael J. Astrue, Commissioner of Social Security ("the Commissioner"), denying Plaintiff's applications for a Period of Disability ("POD") and Disability Insurance Benefits ("DIB"), and Supplemental Security Income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 416(i), 423, 1381 *et seq.* ("the Act").  This Court has jurisdiction pursuant to 42 U.S.C. § 405(g).  This case is before the undersigned United States Magistrate Judge pursuant to the consent of the parties entered under the authority of 28 U.S.C. § 636(c)(2).  For the reasons set forth below, the Commissioner's final decision is AFFIRMED.

## I.   PROCEDURAL HISTORY

On August 3, 2005, Plaintiff protectively filed applications for POD, DIB, and SSI and alleged a disability onset date of February 9, 2005.  (Tr. 15.)  The applications were denied initially and upon reconsideration, so Plaintiff requested a hearing before an administrative law judge ("ALJ").  (Tr. 15.)  On December 4, 2008, an ALJ held Plaintiff's hearing.  (Tr. 15.)  Plaintiff appeared, was represented by counsel, and testified.  (Tr. 15.)  A vocational expert ("VE") and a medical expert ("ME") also appeared and testified, and a Spanish language translator appeared and translated portions of the hearing between English and Spanish.  (Tr. 15.)  On November 4, 2009, the ALJ found Plaintiff not disabled.  (Tr. 34.)  On December 20, 2010, the Appeals Council declined to review the ALJ's decision, so the ALJ's decision became the Commissioner's final decision.  (Tr. 2.)  On February 15, 2011, Plaintiff timely filed her complaint to challenge the Commissioner's final decision.  (Doc. No. 1.)

On June 30, 2011, Plaintiff filed her Brief on the Merits.  (Doc. No. 19.)  On August 15, 2011, the Commissioner filed his Brief on the Merits.  (Doc. No. 20.)  On September 7, 2011, Plaintiff filed her Reply Brief.  (Doc. No. 22.)

Plaintiff asserts five assignments of error:  (1) the ALJ's analysis of the medical evidence is confusing; (2) the ALJ improperly assessed Plaintiff's functional limitations based on his personal opinion rather than the medical evidence and the opinions of physicians; (3) the ALJ improperly assessed Plaintiff's credibility; (4) the ALJ failed to account for all of Plaintiff's limitations in his residual functional capacity ("RFC") determination; and (5) the Commissioner failed to meet his burden of showing that Plaintiff could perform a significant number of jobs in the national economy.

2

## II.  EVIDENCE

### A.    Personal and Vocational Evidence

From February 9, 2005, the alleged disability onset date, to March 28, 2008, Plaintiff qualified as a "younger individual age 18-44."  (Tr. 30.)  From March 29, 2008, through the date of the ALJ's decision, Plaintiff qualified as a "younger individual age 45-49."  (Tr. 30.)  She has a high school education and is able to communicate in English.  (Tr. 30.)  Her education did not provide for direct entry into skilled work.  (Tr. 30.)  She has past relevant work experience as a hand assembler; a person adding stickers to envelopes; sales attendant handling returns of merchandise; sewing machine operator for lampshades; assembler of aircraft plastics; cleaner; polisher and buffer; and glove repairer in the dry-cleaning industry.  (Tr. 28-29.)

### B.    Medical Evidence

#### 1.    Plaintiff's Physical Impairments

On or around February 8, 2005, Plaintiff fractured her right ankle.  (Tr. 110, 112, 423.)  On February 17, 2005, Plaintiff underwent surgery on her right ankle, whereupon her ankle was reinforced with a plate, screws, and a wire to correct the fracture.  (Tr. 360-62.)  X-rays authenticated by Dr. Harvey J. West, M.D., revealed that, by April 6, 2005, the fracture was healing without complications.  (Tr. 417.)

On April 7, 2005, Plaintiff presented to the Med Care Clinic with a complaint of left ankle pain and swelling after twisting the ankle the night before.  (Tr. 368, 415.)  Attending physician Charles L. Emerman, M.D., indicated that Plaintiff had no other complaints.  (Tr. 368.)  An x-ray authenticated by Dr. Alexander J. Kondow, M.D.,

3

revealed a "[s]mall avulsion fracture of the distal left fibula with soft tissue swelling." (Tr. 415.)

On April 11, 2005, Plaintiff presented to Dr. Laurie McCreery, M.D., and Dr. William S. Barnes, D.M.D., with complains of neck, shoulder, and back pain. (Tr. 363-64.) Dr. Barnes reported the following. Plaintiff presented in a wheel chair; explained her ankle injuries; and reported that she had suffered generalized neck and back pain and pain in her left shoulder that extended into her upper left arm that began when she injured her right ankle in February 2005. (Tr. 363.) Dr. Barnes suspected that Plaintiff's shoulder pain was caused by Plaintiff's crutches and recommended that Plaintiff receive training on their proper use. (Tr. 364.) Dr. Barnes also set up a follow-up appointment for Plaintiff with the orthopedic department. (Tr. 364.)

On May 4, 2005, Plaintiff presented to Ms. Surekah Shah for physical therapy. (Tr. 377-82.) Ms. Shah indicated that Plaintiff reported the following. (Tr. 377.) Plaintiff injured her right ankle in February 2005 when she fell off her porch, and she injured her left ankle in April 2005 when she fell while getting out of a wheel chair. (Tr. 378.) Plaintiff underwent surgery on her right ankle on February 17, 2005. (Tr. 378.) A cast was applied to her right ankle until the end of April when Plaintiff was given an air cast and was cleared to put full weight on it. (Tr. 378.) Plaintiff also was given an air cast for her left ankle, but her physicians discontinued the left ankle air cast by the end of April. (Tr. 378.) Plaintiff continued to use two crutches because she was afraid she would fall again. (Tr. 378.) She "scooted" up and down the three steps that lead into her apartment, rather than ambulated, because she was afraid of falling again. (Tr. 378-79.) She did not go up or down the nine steps leading to her basement. (Tr. 378.)

4

The pain in Plaintiff's right ankle was rated at 5 out of 10 in severity, and the pain in her left ankle was rated at 3 out of 10 in severity.  (Tr. 378.)  The pain was "stabbing," increased with weight bearing, and decreased with rest, elevation, and application of cold packs.  (Tr. 378.)

On May 6, 2005, Plaintiff presented to Ms. Shah for physical therapy.  (Tr. 375-77.)  Ms. Shah reported that Plaintiff tolerated therapy well and indicated that, after therapy, Plaintiff reported that the pain in her left ankle resolved and the pain in her right ankle reduced to 4 out of 10 in severity.  (Tr. 376.)

On May 19, 2005, Plaintiff presented to the emergency room with a complaint of pain in her right knee that radiated throughout her upper and lower leg, which began during a physical therapy session that day.  (Tr. 393, 412.)  An x-ray of Plaintiff's right knee authenticated by Dr. Avram E. Pearlstein, M.D., revealed "no identifiable fracture, dislocation, arthritic change or lytic or blastic lesion."  (Tr. 411.)

On May 25, 2005, Plaintiff presented to Dr. Lynn Jedlicka, M.D., for a follow-up.  (Tr. 398.)  Dr. Jedlicka reported the following.  Plaintiff had been using crutches and an air cast to assist with walking until her physical therapy session on May 19, 2005.  (Tr. 398.)  Plaintiff's right knee pain that began during that physical therapy session resolved completely after Plaintiff took Tylenol #3 and ibuprofen.  (Tr. 398.)  Plaintiff continued to complain of left ankle pain that worsened with walking.  (Tr. 398.)  Plaintiff rated her left ankle pain at 5 out of 10 in severity, although ibuprofen 600 helped the pain.  (Tr. 398.)  Dr. Jedlicka recommended that Plaintiff refrain from physical therapy until she obtained clearance from the orthopedic department; use a "walking boot"; bear weight as tolerated with crutches; and continue to take ibuprofen as prescribed.  (Tr.

5

398.)

Also on May 25, 2005, x-rays authenticated by Dr. West revealed that Plaintiff's right ankle was healing without complications and Plaintiff's right foot was normal.  (Tr. 409.)

On June 21, 2005, Plaintiff presented to the emergency room with complaints of an onset and worsening of pain in her right hip and low back.  (Tr. 399.)  X-rays of Plaintiff's lumbar spine authenticated by Dr. Zahid R. Shah, M.D., revealed the following.  (*See* Tr. 408.)  There was only "very mild end-plate spurring through [Plaintiff's] lumbar spine[; a]lignment of the vertebral bodies remain[ed] intact without evidence of fracture or subluxation[; t]he vertebral heights and disc spaces [were] maintained[; and f]acent sclerosis [was] seen at L4-5 and L5-S1."  (Tr. 408.)  X-rays of Plaintiff's pelvis also authenticated by Dr. Shah revealed "[n]o identifiable abnormalities."  (Tr. 408.)  Plaintiff was discharged in an improved condition.  (Tr. 403.)

On June 29, 2005, Plaintiff presented to Dr. John K. Sontich, M.D., for a follow-up on her ankles.  (Tr. 406.)  Dr. Sontich reported that x-rays evidenced boney healing of Plaintiff's right ankle fracture, but that Plaintiff continued to complain of pain upon weight bearing within her range of motion, grinding, and swelling.  (Tr. 406.)  Dr. Sontich was concerned that Plaintiff's pain was "hardware related," and recommended that Plaintiff continue to wear a "walking boot" and follow up with her primary surgeon, Dr. Patterson.  (Tr. 406.)

On March 2, 2006, Plaintiff presented to Dr. J. Benjamin Smucker, M.D., to establish a treatment relationship at the orthopedic department regarding her right ankle, neck, and left shoulder pain.  (Tr. 307.)  Dr. Smucker indicated that Plaintiff

reported that her neck pain predominantly was left paraspinal and along the left

trapezius.  (Tr. 307.)  Dr. Smucker further reported the following.  Plaintiff continued to

wear an air cast walking boot.  (Tr. 307.)  An x-ray of Plaintiff's right ankle showed that

Plaintiff's right ankle was well healed with intact hardware; an x-ray of Plaintiff's left

shoulder was unremarkable; and an x-ray of Plaintiff's spine showed "straightening of

normal lordosis and [degenerative disc disease] with anterior osteophytes [and] normal

alignment."  (Tr. 307.)  Dr. Smucker recommended that Plaintiff undergo physical

therapy for her left shoulder; resume physical therapy for her right ankle; wean off of

using the air cast walking boot; and follow up with the spine clinic if her neck pain

continued or worsened.  (Tr. 307.)  Dr. Smucker noted that, if physical therapy did not

help Plaintiff's right ankle pain, Plaintiff could consider whether to have the hardware in

her right ankle removed.  (Tr. 307.)

On April 3, 2006, Plaintiff presented to Dr. Alexander C. Garber, M.D., at the

orthopedic department with a complaint of pain in her right ankle.  (Tr. 309.)  Dr. Garber

indicated that Plaintiff reported her pain at 5 out of 10 in severity.  (Tr. 309.)  Dr. Garber

reported that he discussed the possibility of removing the hardware from Plaintiff's right

ankle, and that Plaintiff indicated she preferred conservative treatment.  (Tr. 309.)

On May 1, 2005, Plaintiff presented to Dr. Smucker with complaints of right ankle

pain.  (Tr. 310.)  Registered nurse Kaye Sampson Collins noted on Plaintiff's chart that

Plaintiff ambulated with a cane, limped, and had been non-compliant with physical

therapy because, as Plaintiff reported, the physical therapy was too painful.  (Tr. 310.)

Dr. Smucker noted that Plaintiff rated her pain at 6 out of 10 in severity and was

considering removal of the hardware in her right ankle.  (Tr. 310.)

7

On November 3, 2006, Plaintiff presented to the hospital with complaints of facial pain, frontal headaches, congestion, and upper back and neck pain.  (Tr. 311.) Certified nurse practitioner Mirna Carias noted that Plaintiff rated her pain at 8 out of 10 in severity, and Ms. Carias diagnosed Plaintiff with acute sinitus, and myalgias and myositis not otherwise specified.  (Tr. 312.)  Ms. Carias gave Plaintiff Nasonex nasal spray, ibuprofen, and flexeril, and recommended that Plaintiff drink fluids.  (Tr. 311-12.)

On November 13, 2006, Plaintiff presented to Dr. Mahidhar M. Durbhakula, M.D., with continued complaints of right ankle pain.  (Tr. 313.)  Dr. Durbhakula diagnosed Plaintiff with a closed bimalleolar fracture of the ankle and Achilles tendinitis; opined that most of Plaintiff's symptoms appeared to be caused by the tendinitis; and deferred an evaluation for any need to remove the hardware in Plaintiff's right ankle until after the tendinitis resolved.  (Tr. 313.)

Also on December 11, 2006, Plaintiff presented to Ms. Andrea Lamastra for physical therapy.  (Tr. 314.)  Ms. Lamastra indicated that Plaintiff reported she had gone on a walk with her daughter without need of a cane, and that she had no pain. (Tr. 314.)  Ms. Lamastra noted that Plaintiff was "much improved with ambulation [and n]o longer using [a] cane [for] community distances," but "[c]ontinue[d] to be limited by decreased balance right."  (Tr. 314.)  On December 18, 2006, Ms. Lamastra indicated that Plaintiff reported no pain and that Plaintiff had no complaints.  (Tr. 316.)

On January 15, 2007, Plaintiff presented to Dr. John M. Ryan, M.D., in the orthopaedics department with complaints of "increased sensitivity" in her right ankle. (Tr. 318.)  Dr. Ryan indicated that Plaintiff was able to ambulate without pain, and that Plaintiff was not interested in surgery to remove the hardware in her right ankle at that

8

time.  (Tr. 318.)  Dr. Ryan recommended that Plaintiff take NSAIDs, continue her home

exercises as taught in physical therapy, and follow up in three months.  (Tr. 318.)

On May 3, 2007, state agency reviewing medical consultant Elizabeth Das, M.D.,

performed a physical RFC assessment of Plaintiff, as follows.  (Tr. 285-92.)  Plaintiff

could lift and carry 20 pounds occasionally and 10 pounds frequently; and sit, stand,

and walk for about 6 hours in an 8-hour workday with normal breaks.  (Tr. 287.)  Her

abilities to push and pull were limited in her lower extremities because of a right ankle

fracture from February 2005 that continued to cause her pain.  (Tr. 287.)  Plaintiff could

occasionally climb ramps, stairs, ladders, ropes, and scaffolds.  (Tr. 288.)  She had no

manipulative, visual, communicative, or environmental limitations.  (Tr. 289-90.)  Dr.

Das noted that there were no treating or examining source statements in Plaintiff's

records regarding Plaintiff's physical capacities.  (Tr. 292.)  Dr. Das concluded that

Plaintiff could perform light work, which accounted for Plaintiff's right ankle pain that

persisted for over twelve months.  (Tr. 285.)

On September 10, 2007, Plaintiff presented to the orthopaedics department with

complaints of ankle pain after falling four weeks prior, as well as left-sided neck pain

that she had been suffering for approximately one month.  (Tr. 273.)  Dr. James H.

Walsh, D.O., attended to Plaintiff and indicated that Plaintiff denied numbness, tingling,

and perceived weakness.  (Tr. 273.)  Dr. Walsh diagnosed Plaintiff with a right ankle

sprain and neck pain of muscular origin; gave Plaintiff Motrin; and instructed Plaintiff to

follow up with her primary care physician.  (Tr. 274.)

On December 11, 2007, Plaintiff presented to the emergency department with

9

complaints of pain in her left arm and hand.  (Tr. 268-73.)  Dr. Jonathan E. Siff[1]

attended to Plaintiff and indicated that Plaintiff reported the pain began after she moved

a stack of boxes and attempted to prevent a box from falling.  (Tr. 272.)  Radiographs of

Plaintiff's hand were normal.  (Tr. 273.)  Dr. Siff gave Plaintiff ibuprofen and Percocet,

as well as a wrist splint, and instructed Plaintiff to follow up with her primary care

physician.  (Tr. 272.)

On April 22, 2008, Plaintiff presented to the emergency department with

complaints of pain in her neck, left shoulder, legs, and left ankle.  (Tr. 264-66, 280.)  Dr.

Sara Laskey, M.D., attended to Plaintiff and indicated that Plaintiff reported her pain set

in without injury, and that the pain felt like a "twisting" or "ache" that radiated into her

wrist.  (Tr. 264, 280.)  X-rays of Plaintiff's left wrist and left foot were normal.  (Tr. 277,

279.)  An x-ray of Plaintiff's back revealed degenerative disc disease with narrowing of

the neural foramina on the left at C2-3 and C5-6.  (Tr. 278.)  Dr. Laskey diagnosed

Plaintiff with cervical radiculpathy and suspected it was caused by a herniated disc

around C5-6 or C6-7.  (Tr. 266.)  Dr. Laskey also diagnosed Plaintiff with a left

ankle/foot strain.  (Tr. 266.)  Dr. Laskey gave Plaintiff an ankle air cast and pain

medication, and instructed Plaintiff to follow up with her primary care physician.  (Tr.

266.)

On April 28, 2008, Plaintiff presented to Dr. Victoria Brobbey.[2]  (Tr. 190.)  Dr.

Brobbey indicated the following.  Plaintiff complained of pain in her left neck, arm, and

---

[1] The record does not clearly indicate Dr. Siff's credentials.

[2] The record does not clearly indicate Dr. Brobbey's credentials.

wrist and numbness and tingling in her left wrist.  (Tr. 190.)  The pain in her neck and

arm was sharp and radiated down her shoulder and into her arm and hand.  (Tr. 190.)

Also, her left hand was weak and she could not hold objects tightly or open jars.  (Tr.

190.)  Dr. Brobbey suspected that Plaintiff suffered "some cervical radiculopathy in the

left UE"; indicated that she would begin Plaintiff on a course of steroid treatment;

continued Plaintiff on her Percocet and Ibuprofen; and referred Plaintiff to PM&R Clinic.

(Tr. 191.)

On May 22, 2008, resident physician Kermit Fox III, M.D., examined Plaintiff as a

new patient at PM&R Clinic, under the supervision of Dr. Michael A. Harris, M.D.  (Tr.

255-58.)  Dr. Fox reviewed Plaintiff's medical history and reported the following.

Plaintiff had "a history of progressive mid-cervical degenerative changes with myalgias

in regional muscles," but with "no radicular symptoms."  (Tr. 257.)  Plaintiff also

"present[ed] with one month of presumably non-traumatic, left wrist pain and swelling in

[the] region of her TFCC."[3]  (Tr. 257.)  Plaintiff rated the pain in her wrist and neck at 8

out of 10 in severity, although she had no radicular complaints.  (Tr. 255.)  Dr. Fox

indicated that he would obtain new x-rays of Plaintiff's wrist and cervical spine and

compare them with prior x-rays; gave Plaintiff a wrist splint to wear at night;

recommended occupational therapy for Plaintiff's left wrist and physical therapy for her

neck and left shoulder; gave Plaintiff Ultram for pain and noted that NASIDs were not

appropriate medications because they would cause Plaintiff gastrointestinal bleeding;

---

[3] "TFCC" appears to stand for "Triangular Fibrocartilage Complex Tear" (*see* Tr. 167, 460), which is a tear in one of the ligaments in the wrist between the navicular bone and the triangular bone (*see* Tr. 460).

11

and instructed Plaintiff to return to the clinic in six weeks.  (Tr. 258.)  Dr. Harris

concurred with Dr. Fox's evaluation and plan.  (Tr. 258.)

On July 22, 2008, Raymond A. Lumpkin, Plaintiff's physical therapist, indicated

that Plaintiff reported she began having daily headaches since July 19, 2008.  (Tr. 171.)

Mr. Lumpkin further reported the following.  Plaintiff reported she awoke with her

headaches and that they lasted most of the day; and that she had been feeling a lot of

stress because of "family issues."  (Tr. 171.)  Cervical manipulation and traction helped

relieve some of Plaintiff's headache pain.  (Tr. 239, 241.)

### 2.    Plaintiff's Mental Impairments

On August 29, 2005, Plaintiff indicated to Social Security that she felt anxious,

nervous, and depressed all of the time.  (Tr. 153.)  On October 6, 2005, Plaintiff's

daughter brought Plaintiff to the hospital after Plaintiff complained of depression and

suicidal ideation.  (Tr.302.)  Dr. Lance D. Wilson, M.D., attended to Plaintiff and

reported the following.  (Tr. 302-03.)  Plaintiff initially indicated that she felt like she

wanted to die, but she did not have a plan for suicide.  (Tr. 303.)  During her stay in the

emergency department, she began speaking of how she valued her life, and a

psychologist who examined her believed she was stable and appropriate for discharge

with outpatient therapy.  (Tr. 303.)  The resident psychiatrist gave Plaintiff a prescription

for Zoloft, and Plaintiff was discharged.  (Tr. 303.)

On October 6, 2005, Plaintiff underwent a consultative psychological

examination by Dr. David V. House, Ph.D., upon the request of the Bureau of Disability

Determination.  (Tr. 338-44.)  Dr. House noted that Plaintiff's "[g]rooming and hygiene

appear noticeably poor because of body odor."  (Tr. 340.)  Dr. House assessed Plaintiff

12

as follows.  Plaintiff's concentration and attention were markedly impaired because of what appeared to Dr. House to be disturbances in thought.  (Tr. 343.)  Plaintiff's ability to understand and follow directions "appear[ed] moderately limited."  (Tr. 343.)  She would have difficulty following simple directions beyond one or two steps on a consistent basis because of disruptions in her thinking.  (Tr. 343.)  Her ability to withstand stress and pressure was "at least moderately limited" primarily because of her depression related to her health.  (Tr. 343.)  Her ability to relate to others and deal with the general public "appear[ed] moderately to markedly limited."  (Tr. 343.)  She presented as socially isolated and demonstrated significant difficulties in terms of interacting with others.  (Tr. 343.)  Her level of adaptability "appear[ed] mildly limited," as she received no treatment.  (Tr. 343.)  And her insight and judgment "appear[ed] markedly limited."  (Tr. 343.)  Dr. House concluded that Plaintiff participated in all routine daily activities minimally; that she would require some supervision in managing her daily activities and handling her finances; and that her overall level of functioning was at a reduced level of efficiency.  (Tr. 343.)

Dr. House diagnosed Plaintiff with a mood disorder secondary to her health issues and with major depressive features, as well as a psychotic disorder not otherwise specified.  (Tr. 344.)  Dr. House assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 15[4] based on Plaintiff's intermittent hygiene.  (Tr. 344.)

On December 6, 2005, state agency reviewing psychological consultant Mel

---

[4] A GAF score between 11-20 indicates some danger of hurting self or others, or occasionally failing to maintain personal hygiene, or gross impairment in communications.  *See Diagnostic and Statistical Manual of Mental Disorders* 34 (American Psychiatric Association, 4th ed. rev., 2000).

Zwissler[5] attempted to perform a Psychiatric Review Technique but found that there

was insufficient evidence to support a medical disposition.  (Tr. 325.)  Mr. Zwissler

explained that "[d]ue to [Plaintiff's] failure to fully cooperate at the [consultative

examination] we are unable to truly address her mental limitations, if any."  (Tr. 337.)

On April 20, 2007, state agency reviewing psychological consultant Karla Voyten,

Ph.D., affirmed Mr. Zwissler's assessment.  (Tr. 284.)

     **C.**    **Hearing Testimony**

         **1.**    **Plaintiff's Testimony**

     Plaintiff testified as follows.  She last worked as a paper packer a month prior, for

two or three days a week and sometimes for 8 hours a day.  (Tr. 437-38.)  The job had

lasted for three months and ended because there was no more work to be done.  (Tr.

438.)  Nevertheless, Plaintiff was not able to perform her work as a paper packer

because she suffered back and leg pain, and her leg would swell.  (Tr. 438.)

     Plaintiff did not go grocery shopping.  (Tr. 449.)  She could not lift a five pound

bag of sugar or a gallon of milk.  (Tr. 449.)  She could, however, lift and carry a cup of

coffee.  (Tr. 449.)  Also, if she were at a grocery store, she would be able to pick a jar

off a shelf and place it in a shopping cart.  (Tr. 453.)

     Plaintiff could walk for only five minutes before she needed to sit down (Tr. 449);

however, she could walk one block on level ground.  (Tr. 452.)  She could stand for one

hour before she needed to sit; and she could sit for between an hour and an hour-and-

a-half before she needed to stand.  (Tr. 450.)  Walking down steps caused Plaintiff

---

[5] The record does not clearly indicate Mel Zwissler's credentials.

pain.  (Tr. 450.)  If she stooped, crouched, or squatted, she would not be able to return to a standing position.  (Tr. 450.)  She could not kneel.  (Tr. 45.)  She could crawl, and she did so when she was not able to stand and walk.  (Tr. 450.)  She could not bend at the waist.  (Tr. 450.)

Further, Plaintiff could not use public transportation, although she could get on and off a bus if she had to.  (Tr. 452-53.)  She also could not perform business transactions at a bank.  (Tr. 452.)

## 2.     The ME's Testimony

The ME reviewed Plaintiff's medical evidence, heard Plaintiff's testimony, and opined as follows.  Plaintiff's activities of daily living were mildly impaired; her ability to maintain concentration, persistence, and pace was mildly impaired; and Plaintiff had no episodes of decompensation.  (Tr. 448.)  The ME could not give an opinion regarding Plaintiff's ability to maintain social functioning because there was a lack of evidence on that issue.  (Tr. 448.)  However,  Plaintiff did not have a "big psychological problem as far as dealing with other people is concerned."  (Tr. 456.)  Accordingly, Plaintiff's impairments, either singly or in combination, did not meet or medically equal an impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  (Tr. 447-49, 451.)

Plaintiff could lift 20 pounds occasionally and 10 pounds frequently.  (Tr. 454.)  She could stand and walk for 6 hours in an 8-hour workday with normal breaks.  (Tr. 454.)  A sit/stand option "would be good" for Plaintiff.  (Tr. 455.)  She would be able to pick something up off the floor if she dropped it, but she would not be able to crawl under a table two or three times a day.  (Tr. 456.)  She could climb steps with the

assistance of a railing.  (Tr. 456.)  But she could not perform work that involved high,

strict production quotas, or assembly line work.  (Tr. 456-57.)

### 3.  The VE's Testimony

Plaintiff's counsel stipulated to the VE's qualifications.  (Tr. 468.)   The ALJ

posed the following hypothetical to the VE:

> I want you to assume a person who's [sic] date of birth is March 30th, 1963,
> graduated from high school in Puerto Rico in 1979, and someone who's [sic]
> past relevant work was what this claimant's past relevant work was. . . .  This
> person is going to be limited to sedentary work, with all that applies to
> exertional or postural activities, subject to the following additional restrictions.
> Our hypothetical person has to have a sit/stand option, cannot climb ladders,
> ropes or scaffolds at all, cannot more than occasionally go up and down
> steps and ramps, but only with a railing.  If there's no railing, then no climbing
> up or down steps or ramps at all. Our hypothetical person is limited to simple,
> low-stressed work, no piece rate work, no work involving negotiation,
> arbitration, confrontation, or other intense interpersonal interaction with the
> public, co-workers, or supervisors. Cannot do any work that involves
> managing or supervising other people, and cannot do any work that involves
> being responsible for the health, safety or welfare of other people.  And for
> the record, I am not including any restrictions involving a language barrier
> [because] I don't think they are justified given the testimony I've heard.

(Tr. 478-79.)  The VE testified that such a person could not perform Plaintiff's past

relevant work but could perform other work as a cashier, for which there were

approximately 500 jobs in the region, 1,400 jobs in Ohio, and 34,000 jobs in the nation.

(Tr. 481.)  The VE explained that, although cashier jobs often were considered "light"

jobs because they required standing, some cashier jobs could be classified as

sedentary; accordingly, her testimony was based on a reduction in cashier jobs to

account for the hypothetical limitation to sedentary work and the need for a sit/stand

option.  (Tr. 480-83.)  She further explained that her testimony was based on the

Occupational Employment Statistic ("OES"), data from County Business Patterns, and

16

an estimate based on her experience.  (Tr. 482.)  The VE conceded that the OES and

County Business Patterns did not indicate a specific number of cashier jobs that could

be performed at a sedentary level with a sit/stand option, and that there was no single

source of information to determine the number of sit down cashier jobs.  (Tr. 484-85.)

However, the VE explained that she obtained a statistical number of general cashier

jobs from the OES, compared that number to the number of locations provided in the

County Business Patterns where, based on her experience, a cashier could be

expected to perform her job sitting, and conservatively estimated the number of sit

down cashier jobs as one percent of the total domain of general cashier jobs.  (Tr. 486.)

### III.    STANDARD FOR DISABILITY

A claimant is entitled to receive benefits under the Social Security Act when she

establishes disability within the meaning of the Act.  20 C.F.R. § 416.905; *Kirk v. Sec'y*

*of Health & Human Servs.*, 667 F.2d 524 (6th Cir. 1981).  A claimant is considered

disabled when she cannot perform "substantial gainful activity by reason of any

medically determinable physical or mental impairment which can be expected to result

in death or which has lasted or can be expected to last for a continuous period of not

less than 12 months."  20 C.F.R. § 416.905(a).  To receive SSI benefits, a recipient

must also meet certain income and resource limitations.  20 C.F.R. §§ 416.1100 *and*

416.1201.

The Commissioner reaches a determination as to whether a claimant is disabled

by way of a five-stage process.  20 C.F.R. §§ 404.1520(a)(4) *and* 416.920(a)(4); *Abbott*

*v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990).  First, the claimant must demonstrate

17

that she is not currently engaged in "substantial gainful activity" at the time she seeks disability benefits.  20 C.F.R. §§ 404.1520(b) *and* 416.920(b).  Second, the claimant must show that she suffers from a "severe impairment" in order to warrant a finding of disability.  20 C.F.R. §§ 404.1520(c) *and* 416.920(c).  A "severe impairment" is one that "significantly limits . . . physical or mental ability to do basic work activities."  *Abbot,* 905 F.2d at 923.  Third, if the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the impairment meets a listed impairment, the claimant is presumed to be disabled regardless of age, education or work experience.  20 C.F.R. §§ 404.1520(d) *and* 416.920(d).  Fourth, if the claimant's impairment does not prevent her from doing her past relevant work, the claimant is not disabled.  20 C.F.R. §§ 404.1520(e)-(f) *and* 416.920(e)-(f).  For the fifth and final step, even if the claimant's impairment does prevent her from doing her past relevant work, if other work exists in the national economy that the claimant can perform, the claimant is not disabled.  20 C.F.R. §§ 404.1520(g), 404.1560(c), *and* 416.920(g).

### IV.    SUMMARY OF COMMISSIONER'S DECISION

The ALJ made the following findings of fact and conclusions of law:

1.    Ms. Delgado first met the insured status requirements of the Social Security Act on October 1, 2000, and continues to meet them through March 31, 2010.

2.    Ms. Delgado has not engaged in substantial gainful activity ("SGA") since February 9, 2005, the alleged onset date, except that she did engage in SGA during the month of October 2008.

3.    From February 9, 2005, the alleged onset date, through the date of this decision, Ms. Delgado had and has the following severe

impairments:

Degenerative disc disease of the cervical spine with radiculitis, and degenerative disc disease of the lumbar spine[;]

Status post fracture of the right ankle in February 2005, and status post fracture of the left ankle in April 2005[;]

Depression[; and]

Anxiety.

4.     Ms. Delgado did not and does not have an impairment or combination of impairments that met, meets, medically equaled, or medically equals one of the Listed Impairments in 20 CFR Part 404, Subpart P, Appendix 1.

5.     After careful consideration of the entire record, I find that from November 11, 2006, the alleged onset date,[6] through the date of this decision, Ms. Delgado had and has the residual functional capacity to perform work activities except for the following limits on Ms. Delgado's ability to work.

Ms. Delgado could and can do work at the sedentary exertional level only, with all that implies with respect to exertional and postural limitations, subject to the following additional limitations:

Ms. Delgado had and has to be able to go from sitting to either standing or walking and from standing and walking to sitting whenever she needed or needs to. This does not necessarily mean that Ms. Delgado had or has to stop working while thus changing positions.

Ms. Delgado could not and cannot climb ladder[s], ropes, or scaffolds.

Ms. Delgado could and can go up and down steps and ramps up to, and no more than, occasionally, and then only with a railing.  In the absence of a railing, she could not and cannot go up and down steps or ramps.

_____

[6] This date is inconsistent with the ALJ's other finding that the alleged onset date is February 9, 2005.  (*See* Tr. 15, 28, 33.)

Ms. Delgado could and can do only simple, low stress tasks.

Ms. Delgado could  not and cannot do any work that involves high or strict production quotas.

Ms. Delgado could not and cannot do any assembly work or piece rate work.

Ms. Delgado could  not and cannot do any work that involves negotiation, arbitration, confrontation, or other intense interpersonal interactions with the public, coworkers, or supervisors.

Ms. Delgado could  not and cannot do any work that involves managing or supervising other people.

Ms. Delgado could  not and cannot do any work that involves being responsible for the health, safety, or welfare of other people.

6.  From February 9, 2005, the alleged onset date, through the date of this decision, Ms. Delgado was and is unable to perform any past relevant work.

. . . . .

10.  Ms. Delgado's acquired job skills were not transferrable to other work.

11.  From February 9, 2005, the alleged onset date, through the date of this decision, considering Ms. Delgado's age, education, work experience, and residual functional capacity, there were and are jobs that existed and exist in significant numbers in the national economy that Ms. Delgado could and can perform.

12.  Ms. Delgado was and is not under a disability, as defined in the Social Security Act, from February 9, 2005, the alleged onset date, through the date of this decision.

(Tr. 17-33) (footnote omitted).

## V.    LAW & ANALYSIS

### A.    Standard of Review

20

Judicial review of the Commissioner's decision is limited to determining whether the Commissioner's decision is supported by substantial evidence and was made pursuant to proper legal standards.  *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 512 (6th Cir. 2010).  Review must be based on the record as a whole.  *Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 535 (6th Cir. 2001).  The court may look into any evidence in the record to determine if the ALJ's decision is supported by substantial evidence, regardless of whether it has actually been cited by the ALJ.  *Id.*  However, the court does not review the evidence *de novo*, make credibility determinations, or weigh the evidence.  *Brainard v. Sec'y of Health & Human Servs.*, 889 F.2d 679, 681 (6th Cir. 1989).

The Commissioner's conclusions must be affirmed absent a determination that the ALJ failed to apply the correct legal standards or made findings of fact unsupported by substantial evidence in the record.  *White v. Comm'r of Soc. Sec.*, 572 F.3d 272, 281 (6th Cir. 2009).  Substantial evidence is more than a scintilla of evidence but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Brainard*, 889 F.2d at 681.  A decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion.  *Ealy*, 594 F.3d at 512.

**B.    The ALJ's Analysis of the Medical Evidence**

Plaintiff contends that remand is warranted because the ALJ's analysis of the record medical evidence is confusing.  For the following reasons, the Court disagrees.

The ALJ stated the following:

> I considered and gave great weight to the observations and opinions of Ms. Delgado's treating sources, other medical sources, other health care providers, and other persons who were involved in treating her.

(Tr. 27.)  The ALJ concurrently gave varying weights to the opinions of examining medical sources and reviewing medical sources.  (*See* Tr. 27-28.)  Plaintiff essentially contends that the ALJs decision is contradictory—that the ALJ cannot simultaneously give the opinions of Plaintiff's medical sources great weight and little weight.  A review of the ALJ's decision, however, supports the conclusion that it is not contradictory—the ALJ gave great weight to the opinions of those medical sources who treated Plaintiff, but gave varying weights to the opinions of those medical sources who merely examined Plaintiff or reviewed Plaintiff's medical records.  Accordingly, this assignment of error is not well taken.  *See* *Shkabari v. Gonzales*, 427 F.3d 324, 328 (6th Cir. 2005) (quoting *Fisher v. Bowen*, 869 F.2d 1055, 1057 (7th Cir.1989)) ("No principle of administrative law or common sense requires us to remand a case in quest of a perfect opinion unless there is reason to believe that the remand might lead to a different result.")

### C.    Whether the ALJ Improperly Rendered Medical Opinions to Support His Determination

Plaintiff contends that the ALJ improperly assessed the severity of Plaintiff's pain in her left arm, headaches, and mental condition based on his personal opinion rather than the medical evidence and the opinions of physicians.  For the following reasons, this assignment of error is not well taken.

The ALJ found that, to the extent Plaintiff's pain in her left arm and headaches were secondary to Plaintiff's degenerative disc disease, they were accounted for in his

22

finding that her degenerative disc disease was a severe impairment; and further found that, to the extent they were separate impairments, the evidence did not support the conclusion that they were severe.  (Tr. 20.)  The ALJ also rejected Dr. House's diagnosis of a psychotic disorder for the following reason:

> I do not consider Dr. House's report, by itself, to be sufficient to persuade me that [Plaintiff] had any psychotic disorder.  My main reason for reaching this conclusion is that he rated [Plaintiff's] [GAF] as being 15. . . .  There is no evidence or testimony in the record that [Plaintiff's] condition was anywhere near as bad as that.

(Tr. 21.)

Plaintiff contends that the ALJ rendered improper medical opinions by considering Plaintiff's pain in her left arm and headaches separately from her degenerative disc disease.  Plaintiff cites no case law in support of this proposition. Further, an ALJ is required to consider a claimant's impairments separately and in combination when determining whether the claimant suffers any sever impairments. *See* 20 C.F.R. § 404.1520(c) ("If you do not have any impairment or combination of impairments which significantly limits your physical or mental ability to do basic work activities, we will find that you do not have a severe impairment.); *Abbot v. Sullivan*, 905 F.2d 918, 923 (6th Cir. 1990) ("[T]he individual must show that he has a 'severe impairment'; that is, an impairment or combination of impairments which 'significantly limits . . . physical or mental ability to do basic work activities.'") (quoting 20 C.F.R. § 404.1520(c)).  The ALJ analyzed Plaintiff's impairments separately as well as in combination, as he was required to do.  Plaintiff's allegation that by doing so, the ALJ rendered an improper medical opinion, is not well taken.

Plaintiff also contends that the ALJ erroneously substituted his lay opinion for

that of Dr. House's opinion when he rejected Dr. House's diagnosis of a psychotic disorder.  The Court disagrees.  The ALJ merely gave Dr. House's opinion little weight because it was unsupported by the record evidence.  Plaintiff has provided no basis to conclude that this was improper.  Accordingly, this assignment of error is not well taken.

### D.    The ALJ's Assessment of Plaintiff's Credibility

Plaintiff contends that the ALJ failed to assess the credibility of her subjective complaints of pain properly.  For the following reasons, this assignment of error is not well taken.

It is well settled that pain alone, if caused by a medical impairment, may be severe enough to constitute a disability.  *See Kirk v. Sec'y of Health & Human Servs.,* 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983).  When a claimant complains of disabling pain, the Commissioner must apply a two step test to determine the credibility of such complaints that is known as the "Duncan Test."  *See Felisky* v *Bowen,* 35 F.3d 1027, 1038-39 (6th Cir. 1994) (citing *Duncan* v. Sec'y of Health & Human Servs., 801 F.2d 847, 853 (6th Cir. 1986)).  First, the Commissioner must examine whether the objective medical evidence supports a finding of an underlying medical condition that could cause the alleged pain.  *Id.*  Second, if there is such an underlying medical condition, the Commissioner must examine whether the objective medical evidence confirms the alleged severity of pain or, alternatively, whether the objectively established medical condition is of such a severity that it can reasonably be expected to produce the alleged severity of pain.  *Id.*

The Duncan Test does not require objective evidence of the alleged pain itself.

24

*Id.* at 1039.  The ALJ must consider all of the relevant evidence, including the following:

(1)     the claimant's daily activities;

(2)     the location, duration, frequency, and intensity of the claimant's alleged pain;

(3)     precipitating and aggravating factors;

(4)     the type, dosage, effectiveness, and side effects of any medications taken to alleviate the pain;

(5)     treatments other than medication that the claimant has received to relieve the pain; and

(6)     any measures that the claimant takes to relieve his pain.

See *Felisky*, 35 F.3d at 1039-40 (citing 20 C.F.R. § 404.1529(c)).  Courts are not required to discuss all of the relevant factors; an ALJ may satisfy the Duncan Test by considering most, if not all, of the relevant factors.  *Bowman v. Chater*, 132 F.3d 32 (Table), 1997 WL 764419, at *4 (6th Cir. Nov. 26, 1997) (per curiam).  However, the ALJ must be clear why he finds that a claimant's subjective statements are not credible:

> It is not sufficient for the adjudicator to make a single, conclusory statement that "the individual's allegations have been considered" or that "the allegations are (or are not) credible."  It is also not enough for the adjudicator simply to recite the factors that are described in the regulations for evaluating symptoms.  The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight.

S.S.R. 96-7p, 1996 WL 374186, at *2 (1996).

 Here, the ALJ found that Plaintiff had medically determinable impairments that could cause Plaintiff's alleged pain, including degenerative disc disease of the cervical spine with radiculitis, degenerative disc disease of the lumbar spine, status post

25

fractures of the right and left ankles, and an injury to the left wrist that at times was suspected to be a TFCC.  (Tr. 18-21.)

To the extent that Plaintiff's alleged headaches and pain in her knees, hips, left wrist, left arm, and left shoulder were separate and distinct impairments, the ALJ found that there was insufficient evidence to conclude that they caused more than minimal limitations in Plaintiff's ability to perform work for a continuous period of at least twelve months.  (Tr. 19-21.)  The ALJ further noted:  that Plaintiff acknowledged that her left wrist pain was reduced when she wore a splint (Tr. 19); that on at least one occasion Plaintiff said she was not suffering from headaches (Tr. 20); and that on at least one occasion Plaintiff acknowledged that she could use public transportation (Tr. 23).

In his credibility assessment, the ALJ explained that he considered all the required factors in assessing Plaintiff's credibility; and that he found Plaintiff's statements credible only to the extent that they supported his RFC determination.  (Tr. 26.)  The ALJ otherwise found Plaintiff not fully credible because the record evidence showed that Plaintiff was engaged in activities she said she was not able to perform:

> There are two explanations in the record for how Ms. Delgado's wrist was injured on December 8, 2007.  On December 11, 2007, she told a physician that she injured it while moving furniture. . . .  On the same day, she told a physician that she injured it while pulling on a rug with boxes on it.  At one point, a box started to fall over.  She used her arm to break the fall.  She felt pain in her wrist but thought then that the pain would go away, so she continued to move things. . . .  The point is that whether she was moving "furniture" or "boxes", she was doing something that, apparently, was contrary to her allegations about her physical inability to do things.
>
> On April 22, 2008, she told someone who was treating her that she had swelling and tenderness over the dorsum of her left foot that was not the result of trauma but "started after she was working outside . . . .  She was able to ambulate but touching the affected area caused her pain. The point is that, to the extent that she was "working outside", she was doing

26

something that, apparently, was contrary to her allegations about her physical inability to do things.

On one occasion, she told the Social Security Administration that she did "light" household chores, when she was able, implying that there were times when she was able.

(Tr. 26-27.)

Plaintiff alleges that "it is not clear what [the ALJ's] credibility finding is."  The Court disagrees.  The ALJ is quite clear that he gave Plaintiff's statements credit only to the extent that they were consistent with the evidence and his RFC determination.

Plaintiff also contends that "the ALJ did not discuss or analyze as required the location, duration, frequency, and intensity of her pain or other symptoms; did not discuss or describe precipitating and aggravating factors; [and] did not discuss or describe the type, dosage, effectiveness and side effects of her medication that she was taking."  (Pl.'s Br. 19.)  But the ALJ is not required to discuss and analyze every factor, *see Bowman*, 1997 WL 764419, at *4, and Plaintiff has not explained what evidence the ALJ should have discussed and how that evidence shows that his assessment of Plaintiff's credibility is not supported by substantial evidence.

Finally, Plaintiff suggests that the evidence upon which the ALJ relied to find Plaintiff's statements not fully credible actually supports the conclusion that her statements are credible.  The ALJ found the facts that Plaintiff had been moving furniture or boxes and working outside were inconsistent with Plaintiff's alleged limitations; however, Plaintiff explains that the fact she injured herself while engaged in those activities shows that she was not capable of performing them, which is consistent with her alleged limitations.  But credibility determinations regarding a claimant's

27

subjective complaints rest with the ALJ, *see Siterlet v. Sec'y of Health & Human Servs., 823 F.2d 918, 920 (6th Cir. 1987)*; the ALJ's credibility findings are entitled to considerable deference, *see Villarreal v. Sec'y of Health & Human Servs.*, 818 F.2d 461, 463 (6th Cir. 1987); and a decision supported by substantial evidence will not be overturned even though substantial evidence supports the opposite conclusion, *Ealy, 594 F.3d at 512*.  The ALJ's conclusion on this issue is reasonable and supports his credibility determination.  Regardless if some of the evidence rationally may be construed to support Plaintiff's position, Plaintiff has failed to show that the ALJ's assessment of her credibility was inadequate and unsupported by substantial evidence.  Accordingly, this assignment of error is not well taken.

> **E.      Whether the ALJ Failed to Account for All of Plaintiff's Limitations in His RFC Determination**

Plaintiff baldly asserts that the ALJ failed to include in his RFC determination functional limitations related to Plaintiff's left arm, left wrist, and headaches.  However, the ALJ explained that, to the extent Plaintiff's left arm pain and headaches were secondary to Plaintiff's degenerative disc disease of the cervical spine, he considered such limitations in his RFC assessment.  (Tr. 20-21.)  The ALJ further explained that, to the extent that Plaintiff's left arm pain, headaches, and left wrist pain were individual impairments, there was insufficient evidence to conclude that they caused more than minimal limitations in Plaintiff's ability to perform work.  (Tr. 19-21.)  Plaintiff has provided no basis to conclude that the ALJ failed to consider Plaintiff's limitations related to her left arm, left wrist, and headaches in his RFC assessment.  Accordingly, this contention is not well taken.

28

Plaintiff also contends that the ALJ erred by not including in his RFC determination limitations based on Dr. House's opinion that Plaintiff was markedly impaired in her ability to maintain attention, concentration, persistence, or pace; and that this was particularly erroneous because Dr. House's opinion was uncontradicted. These contentions also lack merit.  The ALJ found that Dr. House's opinion was inconsistent with Plaintiff's activities of daily living.  (Tr. 24.)  Further, Dr. House's opinion was contradicted by the ME's opinion that Plaintiff was mildly impaired in her ability to maintain attention, concentration, persistence, or pace.  In short, the ALJ rejected Dr. House's opinion because he found that it was unsupported by, and inconsistent with, the record evidence.  Therefore, the ALJ was not required to include such a limitation in his RFC determination.  Accordingly, this assignment of error is not well taken.

### F.     The Commissioner's Burden of Proving a Significant Number of Jobs in the National Economy That Plaintiff Could Perform

At the fifth and final step of an ALJ's analysis, the ALJ must determine whether, in light of the claimant's residual functional capacity, age, education, and past work experience, the claimant can make an adjustment to other work.  20 C.F.R. § 404.1520(a)(4).  At this step, the burden shifts to the Commissioner to prove the existence of a significant number of jobs in the national economy that a person with the claimant's limitations could perform.  *Her v. Comm'r of Soc. Sec.*, 203 F.3d 388, 391 (6th Cir. 1999).  To meet this burden, there must be a finding supported by substantial evidence that the claimant has the vocational qualifications to perform specific jobs. *Workman* v. Comm'r of Soc. Sec., 105 F. App'x 794, 799 (6th Cir. 2004) (quoting *Varley*

29

*v. Sec'y of Health & Human Servs.*, 820 F.2d 777, 779 (6th Cir. 1987)).  Substantial

evidence may be produced through reliance on the testimony of a VE in response to a

hypothetical question, but only if the question accurately portrays the claimant's

individual physical and mental impairments.  *Workman*, 105 F. App'x at 799 (quoting

*Varley*, 820 F.2d at 779).

Here, the VE testified that a person with Plaintiff's personal and vocational

characteristics, and physical and mental limitations as set forth in the ALJ's

hypothetical, could perform work as a cashier, for which there were approximately 500

jobs in the region, 1,400 jobs in Ohio, and 34,000 jobs in the nation.

Plaintiff contends that the VE's testimony does not constitute substantial

evidence to support the Commissioner's step five burden because the VE's testimony

was based on only her experience and she was not able to provide a statistical basis or

statistical method for arriving at the numbers to which she testified; and because the VE

did not parse out how many jobs were part-time or full-time positions.  Contrary to

Plaintiff's contention, however, the VE provided a statistical basis for her testimony—the

OES and County Business Patterns.  Further, the VE provided a statistical method for

arriving at the numbers of jobs to which she testified—she explained that she

conservatively reduced the number of cashier jobs to one percent of the total number of

cashier jobs based on her experience and the statistical data from the OES and County

Business Patterns.  Plaintiff provides no legal basis to conclude that this method was

inappropriate or inadequate, and no legal basis to conclude that the VE should have

specified how many jobs were part-time and full-time.  Accordingly, these contentions

are not well taken.  *Cf. Ruble v. Comm'r of Soc. Sec.*, No. 5:10-cv-361, 2010 WL

5147358, at *11 (N.D. Ohio Dec. 13, 2010) ("Plaintiff does not cite any legal authority

setting forth a legal standard requiring the case record to contain 'studies' supporting

the VE's testimony regarding the number of jobs in the national economy, and the Court

is unaware of such a requirement.  Indeed, although a finding of a significant number of

jobs in the national economy must be supported by substantial evidence, substantial

evidence may be established by a VE's testimony that is based on an accurate

portrayal of the claimant's physical and mental limitations.").

Plaintiff contends in her reply brief that the VE's testimony does not constitute

substantial evidence to support the Commissioner's step five burden because the ALJ's

hypothetical does not accurately portray Plaintiff's limitations.  Plaintiff did not argue this

issue in her Brief on the Merits.[7]  However, the content of Plaintiff's argument

essentially is the same as her argument that the ALJ's RFC determination is

deficient—that the ALJ failed to include limitations based on Plaintiff's left hand, left

arm, and headaches.  Plaintiff further contends the ALJ should have included

limitations in his hypothetical reflecting moderate limitations in Plaintiff's ability to

maintain concentration, persistence, and pace.  But hypothetical questions posed to the

VE need only enumerate those physical and mental impairments that the ALJ finds

supported by the medical evidence in the record.  *Miller v. Sec'y of Health & Human*

*Servs.*, 895 F. 2d 1414 (Table), 1990 WL 10695, at *2 (6th Cir. Feb. 9, 1990) (citing

---

[7] Plaintiff explained in her Brief on the Merits that "Courts have found that any
hypothetical question propounded to the vocational expert that does not
include a claimant's concentration limitations is a defective hypothetical that
does not fully and accurately portray the claimant and is legal error."  (Pl.'s Br.
15.)  But Plaintiff provided no explanation of why this was relevant to her case.

*Meredith v. Bowen*, 833 F.2d 650, 654 (7th Cir.1987)).  And, if the hypothetical question has support in the record, it need not reflect the claimant's unsubstantiated complaints. *Blacha v. Sec'y of Health & Human Servs.*, 927 F.2d 228, 231 (6th Cir. 1990).

As explained above, Plaintiff has provided no basis to conclude that the ALJ failed to consider Plaintiff's limitations related to her left arm, left wrist, and headaches; the ALJ found that the evidence did not support the conclusion that the impairments caused more than minimal limitations; and Plaintiff's statements of the extent to which those impairments limited her were not credible.  Moreover, Plaintiff has provided no reason why the ALJ should have included limitations based on moderate limitations in her ability to maintain concentration, persistence, or pace; indeed, the ALJ rejected Dr. House's opinion of marked limitations, gave weight to the ME's opinion of mild limitations, and Plaintiff has not taken issue with those particular credibility determinations.

In sum, Plaintiff has failed to show that the VE's testimony does not constitute substantial evidence.  Further, 34,000 jobs in the nation may amount to a significant number of jobs.  *See Bishop v. Shalala*, 64 F.3d 662 (Table), No. 94-5375, 1995 WL 490126, at *2-3 (6th Cir. Aug. 15, 1995) (finding that 6,100 jobs nationally constituted a significant number of jobs); *Lewis v. Sec'y of Health & Human Servs.*, No. 94-1807, 1995 WL 124320, at *1 (6th Cir. Mar. 22, 1995) (finding that 14,000 jobs nationally constituted a significant number of jobs); *Girt v. Astrue*, No. 5:09-cv-1218, 2010 WL 908663, at *4 (N.D. Ohio Mar. 12, 2010) (finding that 600 jobs state-wide and 35, 000 jobs nationally constituted significant number of jobs).  Accordingly, Plaintiff's

contention that the Commissioner failed to meet his step five burden is not well taken.

## VI.    CONCLUSION

For the foregoing reasons, the Commissioner's final decision is AFFIRMED.

**IT IS SO ORDERED**.


_s/ Nancy A. Vecchiarelli_____
U.S. Magistrate Judge

Date: February 15, 2012

33